**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

ERICA LINDSAY LEE,                                    Case No.: 21-cv-7934 (LGS)

Plaintiff,                  **PLAINTIFF'S AMENDED**
                                                      **COMPLAINT**

         -against-
                                                      **PLAINTIFF DEMANDS**
ANDREW YANG and FRIENDS OF ANDREW YANG,               **A TRIAL BY JURY**

Defendants.
------------------------------------------------------------------------x

Plaintiff ERICA LEE ("Plaintiff"), by and through her attorneys, White, Hilferty & Albanese, PC, hereby complains of Defendants, upon information and belief as follows:

## NATURE OF THE CASE

1.  Plaintiff brings this action alleging that Defendants violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law 290. *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y. Admin Code 8-107, *et seq.* Plaintiff seeks damages to redress her emotional and financial losses, which were inflicted by Defendants' unlawful discriminatory, retaliatory, and defamatory practices in violation of federal and state statutes.

## JURISDICTION & VENUE

2.  Jurisdiction of this Court is proper under 42 U.S.C. § 2000, *et seq.*, and 28 U.S.C. §§ 1331 and 1343.

3.  The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PROCEDURAL REQUIREMENTS

5.      On July 21, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6.      Plaintiff's formal Charge of Discrimination filed with the EEOC asserted the same factual allegations that are asserted in this Amended Complaint.

7.      On June 24, 2021, Plaintiff received a Notice of Suit Rights from the EEOC, dated June 17, 2021.

8.      Plaintiff has filed this action within 90 days of receipt of the Notice of Suit Rights.

9.      Plaintiff timely and properly filed this suit after exhausting all administrative remedies with the EEOC.

10.     Plaintiff now seeks to amend the Complaint previously filed with this Court.

## THE PARTIES

11.     Plaintiff ERICA LEE was and is a resident of the State of Washington, County of King.

12.     Defendant FRIENDS OF ANDREW YANG, INC. ("Defendant FOAY" and/or "FOAY") is a political campaign with its headquarters in New York, New York. Defendant FOAY announced the campaign on February 1, 2018.

13.     Defendant ANDREW YANG ("Defendant Yang") is the head of Defendant FOAY. During the relevant time period, Defendant Yang was a presidential candidate.

14.     At all times relevant, Defendant FOAY owned, operated, and/or maintained its place of business in New York County, New York.

## BACKGROUND

15.    On February 23, 2019, Plaintiff followed Defendant Yang on Twitter.

16.    On April 11, 2019, Plaintiff made her first campaign donation to Andrew Yang for President.

17.    In May 2019, Plaintiff joined the Andrew Yang Basecamp Facebook group ("Basecamp") and responded to FOAY Volunteer Basecamp Moderator Fred Ramey's ("Ramey") gender-based discriminatory comments.

18.    On May 3, 2019, Plaintiff attended the Andrew Yang for President rally at Seattle Gasworks Park. While at the event, Plaintiff spoke with FOAY National Campaign Finance Director Carly Reilly ("Reilly") regarding applying for a position with FOAY.

19.    On June 6, 2019, Plaintiff attended the Seattle Grassroots Fundraiser for Andrew Yang.

## MATERIAL FACTS

20.    Plaintiff is a female.

21.    On or about May 4, 2019, Plaintiff applied for a field organization position with Defendants. Pursuant to Defendants' website, Plaintiff submitted a cover letter expressing interest in working in field organization for Defendants and noting that Reilly directed her to apply via Defendants' website.

22.    In June 2019, Plaintiff engaged in protected activity by opposing discriminatory comments about women in Defendants' Basecamp.

23.    On June 5, 2019, Ramey messaged Plaintiff asking if she reported a comment in Basecamp. In response, Plaintiff advised Ramey that she reported a Basecamp comment previously wherein a male individual was calling another individual an offensive name. In response, Ramey stated, "That is not okay. Regardless of viewpoints." Plaintiff also noted that there

was "an obvious difference when a woman comments that the men pile on event when not related to them personally and men who say the same are left alone." Ramey then stated, "All politics is man heavy. What you are doing is counterproductive to your own reasoning. Reconsider." Subsequently, Plaintiff asked Ramey about the demographic makeup of the moderators for the Basecamp community because there was a significant amount of sexism and misogyny displayed within the group. Notably, Ramey was the subject of multiple complaints submitted to Defendants due to his use of the words, "bitch" and "cunt," as well as his racist commentary.

24.     On June 8, 2019, Ramey sent Plaintiff a direct message via Facebook stating, "Would you care to help mod for basecamp? I presented your case to the group. We need more people…" Social Media Coordinator Kayle Jellesma ("Jellesma") then emailed Plaintiff onboarding information to become a Basecamp Moderator.

25.     On June 9, 2019, Plaintiff completed and submitted the onboarding documents to Defendants for the Basecamp Moderator role.

26.     On June 12, 2019, FOAY Organizing Director Shaun Looney ("Looney") posted a recruitment announcement for Yang Gang Regional Organizers ("YGRO") in the Yang 2020 Slack Channel.

27.     On June 25, 2019, Defendants retaliated against Plaintiff by denying her the opportunity to be a Moderator for Basecamp. Specifically, Plaintiff sent a follow up message to Jellesma via Facebook regarding the Basecamp Moderator role. In response, Jellesma wrote to Plaintiff, "We are look for more mods, yes, but we reviewed some of the comments you've made on the campaign management and at the moment we are afraid that you may not be a good fit. Our campaign is unorthodox, but that's how we've gotten this far. I hope you

understand our position." Plaintiff then inquired, "Which comments," to which Jellesma responded, "The comments regarding the campaign being composed of millennial's and your discussion with Fred [Ramey] about the female composition of the group…[w]e are working on expanding our reach to female voters, it just so happens that the platforms where Andrew started gaining popularity were male dominated platforms…[w]e are just now starting to expand to more female dominated areas." Clearly, Jellesma's statement regarding Plaintiff's "comments" was in reference to Plaintiff's responses to the gender-based discriminatory comments posted by Ramey in Basecamp in May 2019.

28.     On June 28, 2019, Plaintiff engaged in further protected activity by responding to Jellesma's message stating, "Look I am very sorry for what I posted that made you unsure of my ability to moderate…I think I recall what it was, and it was regarding frustration with what I felt was lack of moderation of the sexism in the group and lack of women, period…" Plaintiff also stated, "The comments you reference were posted before I was offered the opportunity to moderate though, before you sent me the information to review. I don't know what changed." Plaintiff then thanked Jellesma for her consideration.

29.     On June 29, 2019, Jellesma responded to Plaintiff's message stating, in relevant part, "I am not saying that your help is not needed, I am saying that knowing the changes you want to make to Andrew's campaign, you will quickly become frustrated with the limitations of the mod position." Evidently, Jellesma was denying Plaintiff the Basecamp Moderator role because of her opposition to Defendants' gender-based discriminatory comments posted on their social media accounts.

30.     On July 3 and 6, 2019, YGRO Andrea Duncan ("Duncan") contacted Plaintiff to schedule an interview with her for a YGRO position with Defendants in Washington.

31.    On July 9, 2019, Defendants officially hired Plaintiff as YGRO. Defendants represented that Plaintiff would be compensated for her role as YGRO.

32.    On July 11, 2019, Looney posted a recruitment announcement in the Yang 2020 Slack Channel seeking applications for the YGRO position.

33.    On July 12, 2019, Plaintiff echoed concerns raised by Seattle Mayoral Candidate Nikkita Oliver on her Facebook page regarding problematic language in connection with immigration on the Yang 2020 Campaign website. Esther Baldwin ("Baldwin"), who was the Volunteer Administrator for the "Women for Yang" Facebook Group, falsely accused Plaintiff of "sharing propaganda" claiming that the language never appeared on Defendants' campaign website.

34.    On July 13, 2019, Plaintiff contacted Anaami P., who was the Volunteer Administrator of the Women for Yang Facebook group, to discuss the incident that occurred with Baldwin on July 12, 2019.

35.    On August 20, 2019, Volunteer Twitter Manager Shane Thrapp ("Thrapp") sent Plaintiff a message via Twitter inviting her to talk about joining the campaign-authorized "@YangGangHub."

36.    On August 21, 2019, Plaintiff and Thrapp had a telephone conversation, during which they discussed ways to improve Basecamp moderation against sexism and misogyny and about joining the @YangGangHub. During said call, Plaintiff engaged in protected activity by opposing Defendants' gender-based discriminatory practices. Following their phone conversation, Thrapp sent Plaintiff a message stating, "Hey, I do want to give you a heads up…[t]he chats might be rough…[b]ecause it's a place to let out their anger…[t]hat doesn't mean we put up with misogyny, racism, or other BS."

37.     On August 22, 2019, Thrapp retaliated against Plaintiff by falsely accusing her of "publicly raising an outcry" by posting in the Women for Yang Facebook Group. Upon information and belief, Thrapp observed the online confrontation between Baldwin and Volunteer Heidi Day, who posted her criticism on Twitter regarding the sexism and misogyny within Defendants' Basecamp, and falsely assumed that Plaintiff was responsible for the situation due to her previous opposition of Defendants' gender-based discrimination.

38.     On the same date, Plaintiff applied for an Executive Assistant position advertised on Defendants' website. Plaintiff was qualified for the position. However, Defendants further retaliated against Plaintiff by failing to interview and hire her for the Executive Assistant position despite her qualifications.

39.     On August 24, 2019, Thrapp sent a message to Plaintiff stating, in relevant part, "Your issue is being looked at by the campaign and I personally don't care about it anymore." Thrapp's statement was referring to Plaintiff's opposition of the gender-based discrimination exhibited in Defendants' Basecamp. Subsequently, Looney messaged Plaintiff via Slack requesting a telephone call and provided his phone number. Plaintiff then sent Looney a text regarding her availability to which Looney responded by asking to push the call until Monday. In response, Plaintiff stated, "This *situation* has been a source of stress and anxiety for the past three days…" In response, Looney stated, in relevant part, "I'm confused as to what the issue is and I want to make sure it gets resolved."

40.     On August 27, 2019, Plaintiff sent Looney a text message stating, "The issue is that one time back in June, I pointed out the sexism and lack of women in the Basecamp group and since then, anytime Morgan, et al, see something I say on the topic, they take the info back into the group and talk about me for hours." Later that day, Plaintiff sent a follow up text

message to Looney asking, "Is there anything in the works to resolve this?" In response, Looney claimed that he would speak to Jellesma regarding the situation and explicitly stated, "I won't tolerate any behavior that is counter to the values that we stand for."

41.    Between August 27, 2019, and September 25, 2019, Plaintiff did not receive any further communications from Looney.

42.    On September 25, 2019, Plaintiff sent a Slack message to Looney requesting that he escalate her harassment complaints to Defendants' Human Resources Department. Plaintiff then sent a Twitter message to FOAY Senior Political Advisor Steve Marchand ("Marchand") stating, "I've been reporting retaliation in the form of harassment for reporting sexism and misogyny in the Basecamp group and not getting anywhere…[i]s there someone I can talk to…I've been discussing this with Shaun for months." Significantly, Marchand never responded to Plaintiff.

43.    On September 25, 2019, Looney emailed Plaintiff and FOAY employee Christine Nbemeneh ("Nbemeneh") acknowledging the "amazing work" Plaintiff "has been doing for a while now." At approximately 5:44 pm, Thrapp stated to other volunteers in a Discord Group, "She's [Plaintiff] going to go into histrionics when she sees what happens next…[s]he's out…[t]he campaign is going to…"

44.    On September 26, 2019, Plaintiff emailed Nbemeneh a screenshot of Thrapp's message regarding Defendants' removal of Plaintiff from her position, as well as a copy of Thrapp's message to the @YangGangHub Twitter group chat stating, "Erica is being handled by the campaign." In response, Nbemeneh apologized for Plaintiff's experience and offered to speak with her the following day. Plaintiff then provided Nbemeneh with her availability for a telephone conversation on the following day. Significantly, Nbemeneh never

responded to or contacted Plaintiff. Later that day, Thrapp disclosed to prominent members of the Yang Gang in a Discord group chat that "the campaign is fully involved in this and they have been for months," referring to Plaintiff. Thereafter, Plaintiff sent a fourth message to Marchand via Twitter requesting help and stating that she was being harassed by Defendants' employees in connection with Basecamp. Significantly, Marchand never responded to Plaintiff.

45.   On September 27, 2019, FOAY member Sean Copello confirmed the harassment to which Plaintiff was subjected by Defendants by posting a Tweet via his Twitter account stating, "Why is @HumanistHulk [Thrapp] harassing OG #YangGang @AmericaLee [Plaintiff]?"

46.   On September 28, 2019, Defendants retaliated against Plaintiff by deactivating her Slack account. At approximately 1:29 pm, Defendants further retaliated against Plaintiff when Basecamp Manager and YGRO Morgan Rudman ("Rudman") publicly tweeted on her Twitter account that Plaintiff "has been removed as Washington's Yang Gang Regional Organizer." Thereafter, conversations in the FOAY Discord and Twitter contained a "blacklist" with Plaintiff's name on it. Subsequently, Plaintiff called FOAY employee Katie Dolan ("Dolan") advising that she: (1) was the YGRO who was just publicly fired on Twitter by Rudman; (2) had been subjected to ongoing harassment for several months by Defendants; and (3) had pleaded for help from Defendants and was subjected to ongoing retaliation. Plaintiff then requested that Dolan reinstate her (Plaintiff) as YGRO for Washington State and to have someone from the Campaign contact her immediately. Plaintiff then sent a text message to Reilly regarding the situation; however, Reilly failed to respond.

47.    On September 29, 2019, Defendants further retaliated against Plaintiff when FOAY Volunteer/Co-Founder of the Yang Gang Report David Barnes ("Barnes") doxed Plaintiff by publishing a direct message conversation between him and Plaintiff, which included Plaintiff's telephone number, email, and daily work routine. Barnes posted said information on Twitter, Facebook, and in YouTube comments on his own account, as well as other YouTube member accounts, and titled the posts "Erica Lindsay yikes." Subsequently, multiple FOAY employees and volunteers signed a letter detailing the harassment, discrimination, and retaliation to which Defendants subjected Plaintiff. This letter was later delivered to Defendant Yang by Actress Alyssa Milano ("Milano") and Ramey as outlined below. As a result of this incident, Plaintiff's emotional distress was significantly exacerbated.

48.    In or around the same time, FOAY employee Rebecca Nagy ("Nagy") further retaliated against Plaintiff by revealing confidential information Plaintiff provided to Defendants' Human Resources Department. Specifically, in a Facebook message exchange between Nagy and New Jersey YGRO Leah Piotroski ("Piotroski"), Nagy wrote, "[T]here is ABSOLUTELY misogyny in the Yang Gang. No doubt. No question…the big frustration with Erica was that essentially when she brought it to us, her solution was that we fuck off and she take over everything…and we tried so many times to have mediations, talk it through with her…and I know they were planning this for awhile, because 5 weeks ago when I reached out to Erica to mediate, immediately after I DM'd her, I got a message from Fred where he wanted to 'offer advice' on how to 'Deal' with Erica…and his advice was, I shit you not and I have screenshots of this, 'Call her a cunt.'"

49.     On October 1, 2019, Plaintiff had a telephone conversation with Defendant Yang, during which she explained the relentless discrimination and retaliation to which she was subjected during her employment with Defendants. Plaintiff informed Defendant Yang of the above-mentioned letter and stated that the letter would be provided to him by Ramey later that day. In response, Yang told Plaintiff that he would have someone contact her and that she "has his phone number now for use." Notably, each time Plaintiff attempted to contact Defendant Yang, he did not answer or return her calls.

50.     On October 2, 2019, Ramey and Milano delivered to Defendant Yang a copy of the same letter (mentioned above) at a gun control event. In response, Defendant Yang falsely represented to Milano that the situation with Plaintiff was "resolved."

51.     On October 4, 2019, Plaintiff sent a follow up text message to Defendant Yang regarding the situation. In response, Defendant Yang stated, "Thanks Erica – someone will reach out later today…[a]ppreciate your patience, resilience and understanding." Subsequently, FOAY employee Matt Shinners ("Shinners") called Plaintiff, during which Plaintiff reiterated her discrimination and retaliation complaints. In response, Shinners stated, "I will be taking this very seriously" and asked Plaintiff to provide evidence, which Plaintiff subsequently provided.

52.     On October 5, 2019, Defendants further retaliated against Plaintiff when Barnes again doxed Plaintiff and posted the direct message conversation between him and Plaintiff, which included Plaintiff's telephone number, email, and daily work routine, on his Twitter, Facebook, and YouTube accounts. Later that day, Barnes then publicly accused Plaintiff of being a "known political operative that worked for Hillary Clinton" on his Facebook page.

53.     Significantly, after Plaintiff made multiple complaints to Defendants regarding the severe harassment, discrimination, retaliation, and defamation to which she was subjected by Barnes and other FOAY employees, Defendants officially hired Barnes and assigned him to work at the Iowa Caucus in February 2020. Defendants' actions further highlight the favorable treatment Defendants afforded male individuals, as well as their blatant failure to address and ameliorate the clear discrimination, retaliation, and defamation to which Plaintiff was subjected.

54.     On October 6, 2019, Plaintiff emailed Shinners an 80-page report detailing the harassment, discrimination, and retaliation to which Defendants subjected her. Shinners acknowledged receipt and assured Plaintiff that he was reviewing the matter.

55.     On October 18, 2019, FOAY Director of Distributed Organizing Drew Corbitt ("Corbitt") sent a text message to Plaintiff regarding the situation. Plaintiff relayed to Corbitt the ongoing harassment, discrimination, and retaliation to which Defendants subjected her.

56.     On October 20, 2019, Corbitt called Plaintiff to offer her a position, stating, "…that would get you out of that sphere." Plaintiff requested to be reinstated as YGRO and publicly "un-fired."

57.     On October 21, 2019, Plaintiff sent a text message to Corbitt, which included a screenshot of the targeted harassment she continued to experience by Defendants.

58.     On December 14, 2019, @TheRealBCereus, who is a prominent supporter of Defendant Yang, published a smear video, which included Plaintiff's allegations of harassment, discrimination, and retaliation against Defendants. The video is 43 minutes and 32 seconds long and had garnered over 12,000 views.[1]

---

[1] As of September 21, 2021, the video remained one of the most watched videos on the YouTube channel.

59.     Following the unlawful termination of Plaintiff's employment, Defendants hired a significant number of volunteers for permanent roles within FOAY. Specifically, Defendants hired the following male volunteers for full-time positions with FOAY: (1) Casey Gillette; (2) Chris Yum; (3) John McDermott; (4) Andrew Juan; and (5) Jacob Barr. Significantly, Defendants failed to hire Plaintiff and/or denied Plaintiff a permanent position with Defendants due to their discriminatory and retaliatory animus against her based upon her gender and discrimination complaints.

60.     Based on the foregoing, Defendants unlawfully discriminated and retaliated against Plaintiff based upon her gender and engagements in protected activity when opposed Defendants' gender-based discriminatory conduct. Defendants also subjected Plaintiff to unlawful defamation.

61.     Defendants subjected Plaintiff to disparate treatment in the terms and conditions of her employment as compared to similarly situated employees who were not female and/or did not engage in protected activity by opposing Defendants' discriminatory and retaliatory practices. Defendants' actions substantially interfered with Plaintiff's employment.

62.     As a result of Defendants' unlawful discriminatory, retaliatory, and defamatory practices, Plaintiff has suffered and continues to suffer significant financial ramifications, humiliation, outrage, and mental anguish.

**AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION
AGAINST DEFENDANTS UNDER
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

63.     Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

64.   Defendants' discrimination against Plaintiff concerned one of the activities protected by Title VII of the Civil Rights Act of 1964, Section 2000e-2.

65.   Title VII of the Civil Rights Act of 1964, Section 2000e-2, Section 703 states: "It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

66.   Plaintiff is a member of protected classes pursuant to Title VII of the Civil Rights Act of 1964, Section 2000e-2, namely Plaintiff is a female.

67.   Plaintiff possessed proper qualifications for Defendants to continue her employment.

68.   Defendants FOAY and Yang and/or their agents engaged in an unlawful practice by discriminating against Plaintiff because of her gender. Defendants and/or their agents intended to discriminate against Plaintiff on the basis of her gender by targeting her with discriminatory comments about women. Defendant Yang was personally involved in the adverse action taken against Plaintiff, as alleged fully in the preceding paragraphs. Defendant Yang and the above-mentioned employees of Defendant FOAY acted in their official capacities when discriminating against Plaintiff. Defendants failed to adequately investigate and take remedial action against the FOAY employees responsible for harassing and discriminating against Plaintiff. Defendants ultimately terminated Plaintiff's employment based upon pretextual accusations, causing Plaintiff significant mental anguish and emotional distress.

69.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII of the Civil Rights Act of 1964, Section 2000e-2, Plaintiff suffered

and continues to suffer mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

### AS A SECOND CAUSE OF ACTION FOR RETALIATION AGAINST DEFENDANTS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

70.  Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

71.  Title VII prohibits discrimination and retaliation.

72.  Title VII of the Civil Rights Act of 1964, Section 2000e-3(a) states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

73.  Defendants' employment practices as alleged at length herein constitutes an impermissible act of retaliation in violation of Title VII. The stated reasons for Defendants' conduct were not the true reasons but served as a pretext to conceal Defendants' retaliatory animus.

74.  Plaintiff engaged in protected activity when she opposed discriminatory social media posts by Defendants and when she complained about the discrimination and hostile work

environment to which Defendants subjected her. Plaintiff's opposition of discrimination and initiating a complaint of discriminatory conduct constitute protected activities under Title VII.

75.   Defendants were notified of Plaintiff's engagements in protected activity when she complained about the discrimination to which she was subjected as a result of her opposition to Defendants' discriminatory practices. In response to Plaintiff's complaints, Defendants engaged in a plethora of retaliatory conduct. 25

76.   As fully demonstrated within this Complaint, Defendants engaged in a course of retaliatory and adverse conduct against Plaintiff by (1) publicly criticizing Plaintiff on social media; (2) publicly terminating Plaintiff's employment on social media; and (3) publishing Plaintiff's personal contact information following her termination on various social media accounts.

77.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964, Section 2000e-3, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
AGAINST DEFENDANTS UNDER
THE NEW YORK STATE HUMAN RIGHTS LAW**

78.   Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

79.    Plaintiff is a member of a protected class pursuant to New York Executive Law § 296, namely, Plaintiff is a female.

80.    Defendants and/or their agents intended to discriminate against Plaintiff on the basis of her gender.

81.    Defendants' discrimination against Plaintiff concerned activities protected by New York Executive Law § 296.

82.    The New York State Human Rights Law, N.Y. Exec. Law § 296 provides, in pertinent part: "It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

83.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of N.Y. Exec. Law §296, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**AS A FOURTH CAUSE OF ACTION FOR RETALIATION
AGAINST DEFENDANTS UNDER
THE NEW YORK STATE HUMAN RIGHTS LAW**

84.    Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

85.    New York Executive Law § 296(7) prohibits discrimination and retaliation.

86.     The New York State Human Rights Law, N.Y. Exec. Law § 296(7) provides, in pertinent part that, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

87.     Defendants' employment practices as alleged at length herein constitute impermissible acts of retaliation in violation of New York Executive Law § 296(7). The stated reasons for Defendants' conduct were not the true reasons but served as a pretext to conceal Defendants' retaliatory animus against Plaintiff.

88.     Plaintiff engaged in protected activity when she opposed discriminatory social media posts by Defendants and when she complained about the discrimination and hostile work environment to which Defendants subjected her. Plaintiff's opposition of discrimination and initiating a complaint of discriminatory conduct constitute protected activities under N.Y. Exec. Law § 296(7).

89.     Defendants were notified of Plaintiff's engagements in protected activity when she complained about the discrimination to which she was subjected as a result of her opposition to Defendants' discriminatory practices. In response to Plaintiff's complaints, Defendants engaged in a plethora of retaliatory conduct.

90.     As fully demonstrated within this Complaint, Defendants engaged in a course of retaliatory and adverse conduct against Plaintiff by (1) publicly criticizing Plaintiff on social media; (2) publicly terminating Plaintiff's employment on social media; and (3) publishing Plaintiff's personal contact information following her termination on various social media accounts.

91.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of New York Executive Law § 296(7), Plaintiff suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION AGAINST
DEFENDANTS UNDER
THE NEW YORK CITY HUMAN RIGHTS LAW**

92.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

93.    Plaintiff is a member of a protected class pursuant to New York City Human Rights Law, N.Y. Admin. Code § 8-107, namely, Plaintiff is a female.

94.    Defendants and/or their agents intended to discriminate against Plaintiff on the basis of her gender.

95.    Defendants' discrimination against Plaintiff concerned activities protected by N.Y. Admin. Code § 8-107.

96.    The New York City Human Rights Law, N.Y. Admin Code § 8-107 provides, in pertinent part: "It shall be an unlawful discriminatory practice: (a) For an employer or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual orientation, uniformed service or alienage or citizenship status of any person: (i) To represent that any employment or position is not available when in fact it is available; (ii) To refuse to hire or employ or to bar or to discharge from employment such person; or (iii) To discriminate against such person in compensation or in terms, conditions, or privileges of employment."

97.  As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of N.Y. Admin Code § 8-107, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

### AS A SIXTH CAUSE OF ACTION FOR RETALIATION AGAINST DEFENDANTS UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

98.  Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

99.  The New York City Human Rights Law, N.Y. Admin Code § 8-107 prohibits discrimination and retaliation.

100.  The New York City Human Rights Law, N.Y. Admin. Code § 8-107(7) provides in pertinent part that, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter . . . The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment… in a materially adverse change in the terms and conditions of employment…provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."

101.   Defendants' employment practices as alleged at length herein constitute impermissible acts of retaliation in violation of N.Y. Admin. Code § 8-107(7). The stated reasons for Defendants' conduct were not the true reasons but served as a pretext to conceal Defendants' retaliatory animus against Plaintiff.

102.   Plaintiff engaged in protected activity when she opposed discriminatory social media posts by Defendants and when she complained about the discrimination and hostile work environment to which Defendants subjected her. Plaintiff's opposition of discrimination and initiating a complaint of discriminatory conduct constitute protected activities under N.Y. Admin. Code § 8-107(7).

103.   Defendants were notified of Plaintiff's engagements in protected activity when she complained about the discrimination to which she was subjected as a result of her opposition to Defendants' discriminatory practices. In response to Plaintiff's complaints, Defendants engaged in a plethora of retaliatory conduct.

104.   As fully demonstrated within this Complaint, Defendants engaged in a course of retaliatory and adverse conduct against Plaintiff by (1) publicly criticizing Plaintiff on social media; (2) publicly terminating Plaintiff's employment on social media; and (3) publishing Plaintiff's personal contact information following her termination on various social media accounts.

105.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of N.Y. Admin. Code § 8-107(7), Plaintiff suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## AS A SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
### (DEFAMATION)

106.   Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

107.   As fully demonstrated within this Amended Complaint, Defendants intentionally published defamatory statements to third parties regarding Plaintiff's political affiliation, including but not limited to, being a political spy and saboteur; termination of employment; and complaints of discrimination. Defendants knew or should have known that the statements they published about Plaintiff to third parties were false.

108.   Defendants published said false statements on various public social media platforms and Defendants' defamatory conduct significantly harmed Plaintiff's reputation.

109.   As a direct and proximate result of Defendants' unlawful defamatory conduct, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.   Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law 290. *et seq*., and the New York City Human Rights Law, N.Y. Admin Code 8-107, *et seq.* by discriminating against Plaintiff on the basis of her gender and retaliating against Plaintiff following her engagements in protected activity;

B.   Awarding damages to the Plaintiff, resulting from Defendants' unlawful termination of her

employment and to otherwise make her whole for any losses suffered as a result of such

unlawful employment practice;

C.      Awarding Plaintiff compensatory damages for mental, emotional, and physical injury,

distress, pain and suffering and injury to her reputation in an amount to be proven;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the

action;

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and

proper to remedy the Defendants' unlawful employment practices.


Dated: May 3, 2022
       New York, New York


                                        Respectfully submitted,


                                        */s/Samantha E. Hudler*
                                        Samantha E. Hudler
                                        J. Christopher Albanese
                                        White, Hilferty, & Albanese, PC
                                        *Attorneys for Plaintiff*
                                        845 Third Avenue, Sixth Floor
                                        New York, New York 10022
                                        (917) 565-8763
                                        (917) 932-2694